IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC WEST SECURITIES, INC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JOANNA GEORGE and RANDY GEORGE,<br><br>Defendants. | Case No.: C-13-4260 JSC<br><br>**ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (Dkt. No. 3); DENYING DEFENDANTS' MOTION TO VACATE ARBITRATION AWARD (Dkt. No. 24)** |

Pursuant to Section 9 of the Federal Arbitration Act ("FAA"), Plaintiffs move the court to confirm an arbitration award issued in their favor by the Financial Industry Regulatory Authority ("FINRA"). (Dkt. No. 3.) Defendants in this action, Joanna and Randy George, the claimants and counterclaim defendants in the underlying arbitration, have filed a cross-motion to vacate the award under FAA section 10(a). Upon consideration of the papers submitted by the parties, and having had the benefit of oral argument on January 16, 2014, the Court GRANTS Plaintiffs' motion to confirm the award and DENIES Defendants' motion to vacate.

**BACKGROUND**

The underlying dispute that gave rise to the arbitration involved Defendants' investment in a commercial office building as tenants-in-common through Plaintiff Pacific West Securities, Inc., a

registered broker-dealer.  (Dkt. No. 1 at ¶¶ 3, 10.)  When the investment proved unsuccessful, Defendants filed a Statement of Claim with FINRA against Pacific West and several other individuals and entities, raising several causes of action including breach of contract, breach of the duty of care, breach of fiduciary duty, and violations of federal and state security laws.  (Dkt. No. 1 at ¶ 15; Dkt. No. 4-1 at 4; Dkt. 24 at 6.)  Defendants sought more than $1.4 million in compensatory damages, in addition to other relief.  (Dkt. 4-1 at 4.)

Both sides participated in selecting the three arbitrators for the panel.  (Dkt. No. 1 at ¶ 21.)  The parties were given the names of 30 arbitrators, 10 in each of three categories: public chairperson, public, and non-public.  (Dkt. No. 30-1 at 89; Dkt. No. 30-2 at 2.)  Under FINRA procedures, each party could strike up to four names, and rank the remaining names by preference.  In addition, Defendants exercised their right to strike the 10 non-public arbitrators.  (*Id.*)  The parties accepted the panel's composition of Chairman Philip A. Tymon, and Arbitrators Michael L. Garcia and Robert H. Keller.  (Dkt. No. 1 at ¶ 21; Dkt. No. 4-1 at 11.)

The arbitration commenced on March 4, 2013.  (Dkt. No. 4-1 at 10.)  After 10 days of hearings, Defendants provided notice that their counsel had withdrawn his appearance.  (Dkt. 4-1 at 6 ¶ 2, 10.)  Mr. George represented Ms. George and himself for the remaining nine days of evidentiary hearings.  (*Id.*)

The day before evidentiary hearings were scheduled to end, the arbitrators granted Defendants' request for a postponement.  (Dkt. No. 1. at ¶ 23.)  Before the hearings resumed about six weeks later, Defendants moved for the removal of Arbitrator Garcia, on the ground that he had failed to disclose his full employment history, during which he allegedly became familiar with the Georges.  (*Id.*; Dkt. No. 33-1 at 2-6.)  FINRA denied Defendants' motion.  (Dkt. No. 1. at ¶ 23.)  After 19 days of evidentiary hearings, during which both sides cross-examined witnesses, introduced documentary evidence, and presented expert testimony, the panel issued a written award denying Defendants' claims.  (Dkt. No. 1 at ¶¶ 24-25; Dkt. 4-1 at 7-8, 10.)

Defendants oppose Plaintiffs' motion to confirm the award, and move to vacate the award under the FAA, alleging that Chairman Tymon failed to disclose information about his background in the non-profit public broadcasting industry, which amounted to evident impartiality in light of Mr.

George's involvement in the commercial broadcasting industry. (Dkt. No. 24 at 8-9.) Defendants further contend that Tymon's partiality was demonstrated by repeated prejudicial rulings, "each such ruling engineered to shape the outcome of the hearing against the Georges." (Dkt. No. 24 at 16.)

## DISCUSSION

Section 9 of the FAA requires the court to grant a party's motion for an order confirming an arbitration award if (a) the parties have agreed that a specified court may enter judgment upon the award; (b) any party to the arbitration applies to the specified court for confirmation of the award within a year of its issuance; (c) and the court does not vacate, modify, or correct the award under Section 10 or 11 of the FAA. *See* 9 U.S.C § 9. There is no dispute that the first two requirements are satisfied here; the only issue is Defendants' motion to vacate the award.

Section 10(a) provides the exclusive grounds on which a court may vacate an award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a); *see also U.S. Life Ins. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010) (holding that section 10 lists the exclusive grounds for vacating an arbitration award). "Section 10(a)'s limited grounds are 'designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures.' *Id.* (internal quotation marks and citation omitted).

Defendants invoke Section 10(a)(2) (evident partiality of an arbitrator) and Section 10(a)(3) (arbitrator misbehavior or misconduct) as the basis for their motion to vacate.

**I.    Defendants Have Not Established Evident Partiality**

To show evident partiality, a party moving for vacatur "must establish specific facts

3

indicating actual bias toward or against a party or show that [the challenged arbitrator] failed to disclose to the parties information that creates a reasonable impression of bias." *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 645-46 (9th Cir. 2010) (internal quotation marks and alterations omitted); *see also Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 427 (9th Cir. 1996) ("In nondisclosure cases, vacatur is appropriate where the arbitrator's failure to disclose information gives the impression of bias in favor of one party."). "A reasonable impression of bias sufficiently establishes evident partiality because the integrity of the process by which arbitrators are chosen is at issue in nondisclosure cases." *Woods*, 78 F.3d at 427. "Whether the arbitrator's decision itself is faulty is not necessarily relevant." *Id.*

"The burden of proving facts which would establish a reasonable impression of partiality rests squarely on the party challenging the award." *Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 745-46 (9th Cir. 1985); *see also U.S. Life Ins. Co.*, 591 F.3d at 1173 ("The burden of establishing grounds for vacating an arbitration award is on the party seeking it."). "[V]acatur of an arbitration award is not required simply because an arbitrator failed to disclose a matter of some interest to a party." *Lagstein,* 607 F.3d at 645. Instead, an arbitrator is "required to disclose only facts indicating that he "might reasonably be thought biased against one litigant and favorable to another." *Id.* (internal quotation marks and citation omitted). Examples of the "level of partiality" found to constitute "evident partiality" include cases where "(1) an arbitrator's financial interest in the outcome of the arbitration was not disclosed to the parties, (2) a familial relationship made the arbitrator's impartiality suspect when not disclosed, and (3) an arbitrator's former employment by one of the parties was not disclosed." *Ardalan v. Macy's Inc.*, 5:09-CV-04894 JW, 2012 WL 2503972, at *3 (N.D. Cal. June 28, 2012) (citations omitted).

Defendants' allegations of evident partiality rest on Tymon's failure to disclose facts revealing the intersection of George and Tymon's work in the radio broadcasting industry and their antithetical views about commercial radio.

The Employment section of Tymon's Arbitrator Disclosure Report, which includes information through April 26, 2011, lists the following positions:

- Occidental Arts and Ecology Center, Administrative Director – April 1999 to present

4

- General Manager of KZYX FM, General Manager – January to December 1993
- San Francisco State University, Lecturer – August 1992 to present
- Small Business Consultant, January 1988 to April 1999
- Nuclear Information & Resource Service, Executive Director – January 1985 to December 1987
- WBAI-GM, General Manager – January 1982 to December 1985
- Cable TV Information Center, Consultant – January 1980 to December 1982

(Dkt. No. 30-2 at 23.)  In the section titled "Arbitrator Background Information," Tymon stated:

> I have a JD, as well as an MA in Broadcasting.  My professional career has been primarily in non-profit management, particularly in the broadcast field.  I am currently the Administrative Director of the Occidental Arts and Ecology Center and I teach occasionally at the university level, primarily at San Francisco Sate and Sonomo [sic] State.
>
> I have been the General Manager of two public radio stations, as well as a cable television consultant for a firm assisting local governments.  I have also been a consultant for a variety of businesses and organizations as varied as a hat importer and manufacturer, a public TV station, a retail store, a wildlife rehabilitation center, the customer supermarket of a larger supermarket chain, and the state court system.

(*Id.at 25.*)

In support of their motion to vacate, Defendants state that "[f]rom the Internet, and sworn testimony on file with the Federal Communications Commission (the "FCC"), the Georges have discovered the following new information about Tymon's background and former employment that did not appear on any disclosure report given to the Georges."  (Dkt. No. 24 at 15.)  Defendants allege that Tymon impermissibly failed to disclose that he was:

1. Co-vice-chair of the national board of directors of the Pacifica Foundation ("Pacifica"), headquartered in Berkeley, California;

2. Member of the local board of directors of KPFA, Berkeley, CA, a Pacifica owned radio station;

3. One of three founding members of the National Lawyers Guild Center for Democratic Communications and Low Power Radio;

4. General Manager for KOWS-LPFM in Guerneville, California;

5

5. Full-time staff counsel of the National Citizen's Committee on Broadcasting, a Ralph Nader organization;

6. Managing Editor of Access magazine; and

7. Chair of the Russian River Community Trust Advisory Committee.

8. In addition to the foregoing undisclosed employment and background information, Tymon filed under penalty of perjury with the FCC the following background information:

   a. Director and owner of Dragon Fly Communications;

   b. Announcer, WTUR (FM), Tufts University, Medford, MA;

   c. Announcer, KLME radio, Laramie, WY;

   d. Announcer, and news department, KFJC radio, Foothill Junior College, Los Altos Hills, CA;

   e. Announcer, and news department, KPOO (FM), San Francisco, CA;

   f. Account executive, KVRE/KRVE (AM), Santa Rosa, CA;

   g. Consultant to KRCB (TV), Rohnert Park, CA;

   h. Coordinator, East Bay Media Center;

(*Id.* at 15-16.) Most significantly, the two men supported opposing sides of an effort started by "Patricia Scott, the Executive Director of the Pacifica Foundation, to sell-off and restructure Pacifica's radio stations" into commercial stations. (Dkt. No. 24 at 16.) Mr. George, a media broker, served as an outside consultant to Scott during this process, apparently between 1996 and 1998.[1] Defendants assert that "[t]he tumult Ms. Scott started with her efforts to restructure Pacifica's radio assets, assisted by Mr. George, is marked as the beginning of what has later been variously described as 'the 7-year struggle for the soul of Pacifica', 'botched' management, and 'feather ruffling'." (Dkt. No. 24 at 17.)

---

[1] Mr. George states that he became involved with Pacifica in 1996 (Dkt. No. 32-1 at 26), and that Ms. Scott left Pacifica in 1998 (Dkt. No. 24 at 11).

6

From 1998 through 2008, Tymon was a founding member of the National Lawyers Guild Center for Democratic Communication and Low Power Radio ("CDC").  Defendants allege that the CDC was involved with "unwinding" the damage to the Pacifica stations wrought by Ms. Scott, as well as "leading the charge, with Tymon in command, against commercial/corporate radio owners who were attempting to keep the FCC from legalizing" Low Power FM radio stations.  (Dkt. No. 24 at 18.)  Mr. George asserts that he was a strong supporter of the National Association of Broadcasters ("NAB"), which "represented virtually every commercial radio and television station in America, and its media brokers, like Mr. George" and was "Tymon's major adversary in his battle to legalize [Lower Power FM radio stations]."  (Dkt. No. 24 at 18.)  "Mr. George had operated five commercial radio stations in four states, was a prominent media broker, and a strong supporter of the NAB agenda."  (*Id.*)

> The gist of Defendants' motion to vacate is that
>
> Mr. George's involvement in commercial radio was antithetical to what Tymon believed in and advocated about radio.  Tymon and Mr. George were both deeply and intimately involved in not only the same industry, but in the same radio businesses and causes, but they were polar opposites in philosophies and pursuits.

(Dkt. No. 24 at 19.)

Defendants have not met their burden of showing that Tymon failed to disclose information "that creates a reasonable impression of bias" against the Georges and in favor of Pacific West. *Lagstein*, 607 F.3d at 646.  First, it is undisputed that Tymon did not have any relationship with Pacific West and therefore no reason to favor Pacific West.  *See Woods,* 78 F.3d at 427.

Second, the information which Defendants accuse Tymon of failing to disclose was wholly unrelated to the arbitration. The arbitration had nothing to do with the broadcasting industry, let alone the Pacifica dispute or even Low Power FM radio stations.  Defendants seem to be arguing that if they had known of Tymon's active involvement in the Pacifica controversy and in favor of Low Power FM radio stations they would have struck Tymon from the panel.  (*See* Dkt. No. 24 at 30 (stating that the withheld information denied Defendants "the opportunity to make an informed decision about [Tymon's] independence and qualifications before deciding whether or not to reject him from FINRA's list of proposed arbitrators")).  That may be true; indeed, the Court assumes it is.

7

1    The test for vacating an arbitration award, however, is more stringent: nondisclosure of facts that
2    create a reasonable impression of bias against the Georges. *Lagstein,* 607 F.3d at 645.

3          Third, prior to the arbitration, Tymon did disclose information regarding his experience in
4    the broadcast industry.  Specifically, Tymon's Arbitrator Disclosure Report listed a master's degree
5    in broadcasting, his career in non-profit management in broadcasting, his experience as general
6    manager of two public radio stations and as a consultant to a public television station.  (Dkt. No. 30-
7    2 at 25.)  This disclosure apparently contained enough information to alert Mr. George to potential
8    issues with regard to Tymon's involvement in the broadcasting industry; indeed, because of these
9    disclosures the Georges (belatedly) conducted an investigation through the internet to discover the
10   information they now claim should have been disclosed.[2]  The Ninth Circuit, however, has expressly
11   declined "to create a rule that encourages losing parties to challenge arbitration awards on the basis
12   of pre-existing, publicly available background information on the arbitrators that has nothing to do
13   with the parties to the arbitration."  *Lagstein,* 607 F.3d at 646.

14         Fourth, the involvement of Mr. George and Tymon on opposing sides of a public dispute
15   regarding the potential commercialization of certain radio stations and the legalization of Low Power
16   FM radio stations several years before the arbitration does not support an impression that Tymon
17   would be biased against the Georges in this unrelated arbitration.  This conclusion is especially
18   warranted given that Mr. George asserts that "[n]either Tymon nor [Tymon's business partner] Mr.
19   Franck were Pacifica insiders at the time Mr. George was working with Pacifica, and Mr. George
20   had no knowledge of either of them, directly or indirectly, or the organization they used to front their
21   efforts to defeat Ms. Scott's plans and changes, the National Lawyer's [sic] Guild Center for
22   Democratic Communications."  (Dkt. No. 32 at 9.)  Defendants insist that commercial radio (where
23   Mr. George was involved) "and Public Radio operate in two entirely different spheres, rarely cross
24   paths, rarely intersect or interact with each other."  (Dkt. No. 32 at 8.)  Thus, even assuming their

---

[2] Defendants explain that a friend prompted them to investigate Mr. Garcia's background before arbitration proceedings concluded, which led to their filing a motion challenging his disclosures. But they provide no explanation as to why they did not challenge Mr. Tymon's disclosures until more than two years after the parties selected the arbitrators and until Plaintiffs moved to confirm the arbitration award.

8

divergent views and advocacy on the issue constitutes a "connection," it is too stale, attenuated and insubstantial to create an impression of bias. *See New Regency Prods., Inc. v. Nippon Herald Films, Inc.,* 501 F.3d 1101, 1111 (9th Cir. 2007) (recognizing that "courts have rejected claims of evident partiality based on long past, attenuated, or insubstantial connections between a party and an arbitrator"); *Hernandez v. Smart & Final, Inc.*, 09-CV-2266 BEN NLS, 2010 WL 2505683, at *7 (S.D. Cal. June 17, 2010) (explaining that on a motion to vacate based on evident partiality, "[t]he possibility of bias must be direct, definite and capable of demonstration rather than remote, uncertain and speculative") (internal alterations and quotation marks omitted).

In sum, a court may not vacate an arbitration award "simply because an arbitrator failed to disclose a matter of some interest to a party." *Woods,* 78 F.3d at 427 (internal quotation marks omitted). Instead, to succeed on a motion to vacate based on nondisclosure, Defendants must show that the "conflict left undisclosed was real and not trivial." *New Regency Prods., Inc.*, 501 F.3d at 1111 (internal quotation marks and citation omitted) (holding that even if arbitrator breached duty to investigate, vacatur is inappropriate in the absence of a true conflict). Even assuming Tymon and George were pitted directly against each other in this apparently heated battle in the broadcasting industry, a finding of "evident partiality" requires the further assumption that Tymon so held George's work on behalf of commercial radio against him, that he would be partial to George's opponents in an arbitration several years later concerning an entirely unrelated dispute in a completely separate industry. They have not cited any case, and the Court is aware of none, which remotely supports vacatur under the circumstances alleged here.

**II.    Defendants Have Not Established Misconduct or Misbehavior**

Defendants also contend that the arbitration award must be vacated pursuant to section 10(a)(3): "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." They insist the Panel (1) improperly refused to compel the production of Plaintiffs' expert's discovery, (2) improperly refused to allow Plaintiffs' experts to attend the hearing, (3) refused to postpone the

arbitration to allow Defendants to develop new evidence, and (4) refused to allow material witness testimony.

"Arbitrators enjoy "wide discretion to require the exchange of evidence, and to admit or exclude evidence, how and when they see fit."" *U.S. Life Ins. Co.,* 591 F.3d at 1175 (internal quotation marks and citation omitted). The party seeking vacatur must establish that the excluded evidence influenced the outcome of the arbitration. *Id.*

First, Defendants contend the Panel was guilty of misconduct in refusing to compel the production of Plaintiffs' experts' discovery. (Dkt. No. 24 at 24-25.) Other than Plaintiffs' expert's curriculum vitae they do not identify what documents they were refused, let alone how production of those documents would have impacted the outcome of the arbitration. *See Sawyer v. Horwitz & Associates, Inc.*, No. 11–CV–1604–LAB–JMA, 2012 WL 296996, at *7 (S.D. Cal. 2012) (to support vacatur the arbitrator's refusal "must demonstrate bad faith or be "so gross as to amount to affirmative misconduct") (quoting *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 40 (1987)).

Further, the Panel did not treat Defendants' request different from Plaintiffs' request. The Panel ordered Defendants to produce the report prepared by Ms. Ip, a rebuttal expert witness whom the Panel allowed to testify even though Plaintiffs only learned of that witness the morning of the testimony. (Dkt. No. 24-1 at 33.) Tymon explained:

> I think that we have allowed the rebuttal witnesses, and I think we've stretched the definition of rebuttal witness and I think doing that has put the respondent at an enormous disadvantage. I think it's only fair to allow them to have the written report as a way of balancing the disadvantage we put them at.

(*Id.*) It is undisputed that Plaintiffs' expert, Ms. Roth, did not create an expert report. (Dkt. No. 30 at ¶ 12.) The Panel's ruling did not deprive Defendants of a fair hearing.

Second, Defendants insist that the Panel engaged in prejudicial misconduct by failing to allow Defendants' rebuttal expert witnesses to attend the arbitration hearing. Again, Defendants have failed to show any misconduct. As Defendants concede, Plaintiffs only called one expert witness who also served as their rebuttal witness. Defendants, in contrast, called four rebuttal expert witnesses, none of whom Defendants identified in advance of the hearing. The Panel gave reasons

for not allowing these experts to sit in on Plaintiffs' expert's testimony and Defendants have not shown that the reasons were so erroneous as to amount to affirmative misconduct. Defendants do not–and cannot–contend that the Panel refused to allow Defendants' named experts to attend the hearing, the same as Plaintiffs' one expert. Further, they have also not shown how not allowing these experts to sit in on the hearing prior to their own testimony affected the outcome of the arbitration.

Third, Defendants complain that the Panel engaged in misconduct by refusing to continue the arbitration to allow them to "obtain, review and analyze and form expert opinions" about "new evidence" offered by Plaintiffs in their case in chief. The arbitration, however, was continued at Defendants' request from June 6, 2013, until July 24, 2013. (Dkt. No. 4-1 at 9, 10.) It was upon the resumption of the proceedings after this six-week continuance that Defendants offered their rebuttal experts. Defendants have not met their burden of showing misconduct.

Finally, Defendants complain that the Panel improperly limited their rebuttal expert testimony. In particular, they limited Ms. Ip's testimony to "red flags" that should have been obvious during Plaintiffs' due diligence and did not allow her to testify as to the financial implications of those red flags. The Panel reasoned that any testimony beyond the red flags was not proper rebuttal testimony and was instead new evidence. (Dkt. No. 24-1 at 27.) The Panel also refused to allow the rebuttal testimony of another expert, Mr. Kleczewski, on the ground, again, that he was not a proper rebuttal witness. Defendants have not shown that these rulings rendered the arbitration fundamentally unfair. *See Sunshine Min. Co. v. United Steelworkers of America, AFL-CIO, CLC*, 823 F.2d 1289, 1295 (9th Cir. 1987). To the contrary, the Panel afforded Defendants great latitude in presenting their case. Not every ruling against a party amounts to misconduct.

## CONCLUSION

Even if Defendants did not receive a perfect arbitration hearing, "[they] did receive a fair hearing. [They] had notice, [they] had the opportunity to be heard and to present relevant and material evidence, and the decisionmakers were not infected with bias." *United States Life Ins. Co.*, 591 F.3d at 1177 (internal quotation marks and citation omitted). Plaintiffs' motion to confirm the arbitration award is GRANTED and Defendants' motion to vacate is DENIED.

1     The Clerk is directed to close the file.
2     **IT IS SO ORDERED.**
3  Dated:   March 4, 2014

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE